STATE EX REL. HENDERSON ET AL., PLAINTIFFS, *v.* BOARD OF STATE PRISON COMMISSIONERS ET AL., DEFENDANTS.

(No. 2,580.)

(Submitted June 30, 1908.  Decided July 18, 1908.)

[96 Pac. 736.]

*State Prison Board—Contracts for Care of Prisoners—Offer and Acceptance—Mandamus.*

State Prison Board—Powers—Contracts—Unlawful Condition to Award.

1. The state board of prison commissioners exceeded its authority in imposing, by means of a resolution, as a condition precedent to the award of a contract for the care and custody of the inmates of the state prison, the requirement that prospective bidders should furnish funds to enable the state to take over from the then contractors property which the board might deem necessary or desirable to be used in connection with the conduct of the prison.

State Boards—Contracts—Bids—Unauthorized Condition.

2. *Obiter:* A condition embodied in a call for bids invited by a state board, which is unauthorized by law, is void.

Same—Duties—Contracts—Determination of Bids.

3. It is the duty of a state board, when considering bids for a state contract, to unconditionally determine which is the lowest and best bid.

Contracts—Assent of Parties.
  4.  To constitute an enforceable contract there must be a mutual assent of the parties thereto, and they must assent to the same thing in the same sense.
Same—Offer and Acceptance.
  5.  To conclude an agreement, the acceptance of the offer must be unconditional, and must in every respect meet and correspond with the offer.
State Prison Board—Contracts—Offer and Acceptance—Counter-proposals—Non-acceptance—*Mandamus.*
  6.  Plaintiffs agreed with the state board of prison commissioners, as an inducement to declare their bid for the care and custody of the inmates of the state prison the lowest and best, to "guarantee" the state against any claim which the then contractors might have for property belonging to and used by them in the conduct of the prison. The board declared plaintiffs' bid the lowest and best and awarded the contract to them, provided they pay into the state treasury a specified sum to be expended by the board for the purchase of the property above mentioned, and furnish a bond to cover any deficiency after the sum deposited had been exhausted. Plaintiffs furnished the money and bond required, with the condition, however, that the fund thus provided should not be expended for the purpose mentioned until the board had in advance indicated to plaintiffs what property would be taken and the price to be paid therefor. This the board refused to do and subsequently rejected the bid theretofore conditionally accepted. *Held,* that in view of the non-acceptance by the board of the counter-proposal made by plaintiffs, the minds of the parties never met, and an enforceable contract had not been made; and this, even though the board had no authority to impose the conditions above named; *held* further, that *mandamus* did not lie to compel the board to sign and execute the contract.

MANDAMUS by the state, on the relation of F. A. Henderson and another, against the board of state prison commissioners to compel defendants to sign and execute a contract with relators for the care of the inmates of the state prison.  Writ denied.

*Mr. John F. Davies,* and *Mr. E. S. Booth,* for Plaintiffs.

*Mr. A. J. Galen,* Attorney General, *Mr. W. H. Poorman,* and *Mr. F. M. Hall,* Assistant Attorneys General, for Defendants.

MR. JUSTICE SMITH delivered the opinion of the court.

The facts in this case, as disclosed by the affidavit of the plaintiffs and the answer of the defendants, are substantially as follows: On February 5, 1908, the board of state prison commissioners caused to be published a call for bids for the care, custody and maintenance of all prisoners confined in the state prison at Deer Lodge, for the period of two years, commencing the eigh-

teenth day of June, 1908; in answer to said call two bids were received, one from Conley & McTague, the contractors in charge of the prison at the time, and one from the above-named plaintiffs. The bid of the latter was less in amount *per capita* than that of Conley & McTague. It is alleged in the answer, and shown by the records of the board, that after considering said bids the following proceedings took place: "The board   *   *   * found that, in the event of awarding the contract to the said Henderson & Wyman, it would be necessary for the state to take over certain property in said prison belonging to Conley & Mc-Tague, who then had the contract for the care and custody of said · prison and the prisoners therein. That the taking over of said· property of Conley & McTague was required by law, also by the provisions of a contract signed by said board ·and said Conley & McTague, dated May 28, 1906, which contract is now and ever since said date has been in full force and effect between the said Conley & McTague and said board; paragraph 4 of said contract being in words and figures as follows, to wit:

" 'Fourth. It is agreed that the said board of state prison commissioners shall have the right to enter and assume control of the state prison and prison grounds and all other property belonging to the state in charge of the parties of the first part [Conley & McTague] and take charge of all prisoners, whenever they shall deem it necessary 'and to the best interests of the state by reason of breach of this contract, violation of the law, or otherwise; and the parties of the first part agree, at the termination of this contract, or at any other time the board shall deem it necessary to take charge and control of the prison and the prisoners confined therein, to quietly yield up possession of the said state prison without resistance, and turn over to said board all property belonging to the state as well as all property that may be in their possession in the prison, or upon or about the prison grounds, for the use of the prison or the prisoners therein; provided, however, that for all such property necessary to the proper care of the prisoners and the maintenance of the prison belonging to the parties of the first part, delivered to and re-

tained by said board, the parties of the first part shall receive compensation in accordance with their fair market value at such time.   In the event of cancellation of this contract for any reason, the first parties shall be paid in full to the date thereof at the rate herein prescribed.'   *   *   *

"That no appropriation had been made by the legislature for the purpose of taking over and paying for any of said property owned by said Conley & McTague.   That, in the absence of said appropriation by the legislature, the said board had no funds with which to take over said property of Conley & McTague, and was not in position to acquire said property and to turn it over to the said Henderson & Wyman in the event of accepting their bid and awarding said contract to them.   That said property of Conley & McTague, or a large portion thereof, aggregating many thousand dollars in value, was necessary for the proper care, custody and maintenance of said prison and the prisoners therein.   That said board had no inventory of the property in said prison that belonged to the state of Montana, or of the property in said prison that belonged to Conley & McTague, and had no knowledge of the value of the property of Conley & McTague that the board would be required under the law and the contracts with Conley & McTague to take over in order to award the contract to some other person or persons.

"Whereupon Thomas McTague and the said F. A. Henderson and John S. Wyman were called before the said board and examined under oath as to the property in said prison belonging to Conley & McTague, and as to the financial responsibility of said Henderson & Wyman, and their knowledge of the business and affairs of the said prison and their proposed method of conducting same; and thereupon, and at said examination, the said Henderson and Wyman were fully advised and informed by said board as to the condition of the state's funds, and of the absence of any appropriation by the legislature for the purpose of taking over property in the state prison belonging to the said Conley & McTague, and also of the fact that the said Conley & McTague owned a large amount of property in said prison that

would have to be purchased from them in the event that the contract was awarded to some other bidder.   *   *   *   That at said examination of Henderson & Wyman they stated to the board that they would be in a position to pay a sum not to exceed $25,000, for the purpose of taking over the property in said prison belonging to Conley & McTague, if the board awarded the contract to them, and in its judgment decided that the said sum of $25,000 was a reasonable amount to pay for such property of Conley & McTague as the board would consider necessary and desirable for the proper care, custody and maintenance of said prison and prisoners therein.''

That thereupon the board rejected both bids, and ordered that a new call be published, the bids to be opened May 6, 1908. The new call for bids was accordingly made, and was in substance the same as the first call, with the exception of this paragraph, which was inserted therein: "Any and all information respecting ownership of property at the state prison and necessarily used in connection with the proper conduct of the said institution   *   *   *   may be obtained by calling on the clerk of this board at the office of this board.'' Pursuant to said second call, three bids were received—one from the plaintiffs, wherein they offered to care for the inmates of the prison at thirty-nine cents *per capita* per day; one from Conley & McTague of forty-five cents *per capita* per day; and one from Joslyn & Potter, of forty-four cents per day. In the proposal submitted by the plaintiffs the following paragraphs are found: "We further agree under such rules and regulations as may be prescribed by the board to guarantee the state against any liability which it must legally or necessarily assume in the event of the awarding of the said contract to us the transfer of the control and custody of said prisoners to us. We further agree under the rules and regulations of the state board of prison commissioners to furnish all necessary and desirable equipment or property necessary for the proper conduct of the said institution.'' Neither of said paragraphs, nor anything in substance like the same, is found in the first bid of the plaintiffs. Upon

receiving said bids, the board caused to be entered in its minutes a finding that all of the bids were regular, and in accordance with the law and the call, and, after examination and consideration thereof, the board on May 7, 1908, took the following action:

"After full and careful consideration and examination of each and all of said bids, it was by the board duly and regularly found and determined that the said bid of Messrs. Wyman & Henderson was and is the lowest and best bid, provided that certain terms and conditions hereinafter stated shall be complied with by said bidders; and therefore the contract was by the board duly and regularly awarded unto said bidders upon the express terms, conditions and regulations here prescribed, to-wit:

"First.   Said bidders shall on or before the second day of June, 1908, pay into the state treasury of the state of Montana in cash the sum of twenty thousand ($20,000) dollars, with the express understanding and agreement that the board of prison commissioners shall be entitled and authorized to expend the same, or any part or portion thereof in the purchase of such property and personal effects belonging to Messrs. Conley & McTague, the present prison contractors, as the said board shall determine necessary and desirable to be kept and held for the proper conduct and management of the business and affairs of said institution and the proper care of the prisoners therein confined, the board to determine what property shall be purchased and the price to be paid therefor.

"Second.   Said bidders must furnish on or before the second day of June, 1908, a good and sufficient bond, to be approved by the board, in the sum of thirty thousand ($30,000) dollars, in addition to the bond required by law and the call for bids for the faithful performance of the contract, which additional bond shall be in form such as prescribed by the attorney general's office, and conditioned that such bidders will, without cost or expense to the state, receive, accept and pay for such of the property of the present contractors, Messrs. Conley & McTague, as the board may deem necessary or desirable to be used in con-

nection with the conduct of the business and affairs of the said state prison after the said $20,000 cash shall have been exhausted by the board in payment for such property interest.

"This action was finally determined upon by the board because of the existence of a contract made by a previous board obligating the state of Montana to take over and pay for at a reasonable value such property as said contractors Messrs. Conley & McTague, might purchase, considered necessary and desirable to be used in connection with the proper conduct of the business and affairs of said institution; and, further, by reason of the fact that the law, as well as the existing contract, requires the state, upon assuming control of the state prison and taking possession thereof, to pay the contractors the reasonable value of such property by them individually owned.

"It is considered by the board that the provision of the law and these contracts should be fully carried out, and that Messrs. Conley & McTague should be fairly and justly dealt with and paid the reasonable value of any property by them personally owned, and by the board considered necessary and desirable for the proper administration and conduct of the business and affairs of said institution. The amount of property by said contractors owned, in connection with the state prison as shown by the inventory, is considerable in amount and value; said Conley & McTague having been in possession of the prison as contractors for a period of nineteen years last past, and having in consequence paid for and accumulated considerable property by them considered necessary to properly conduct and maintain the institution; and

"Whereas, under and pursuant to the provisions of the law, and the call for bids for the conduct and management of the business and affairs of the state prison and the care of the prisoners therein confined, when contract is let, it is expressly required that the contractor shall furnish without cost, charge, or expense to the state the necessary property with which to conduct the business and affairs of such institution without other additional charge or expense to the state; and

"Whereas, the state is not permitted to spend, either directly or indirectly, any money whatsoever for the support, maintenance or conduct of said institution, other than that provided for by the contract, when the contract system is adopted under authority of the law by the board; and,

"Whereas, there is no money in the state treasury appropriated or available making it possible for the state at this time to pay for any part or portion of the property so owned by said Conley & McTague and used in connection with said prison, and desirable for such use; and,

"Whereas, the only appropriation at present available in connection with the state prison is an appropriation for its maintenance, and the state is therefore not in position to spend a large or any sum of money from the treasury and make purchase of property interests; and,

"Whereas, a change of contract (is) under the law and the existing contract in equity and justice, and in accordance with the law, and on principles of square dealing requires that either the state or the succeeding contractors should pay unto Conley & McTague the reasonable value of property by them personally owned, used, and necessary in connection with the proper conduct of said institution; and,

"Whereas, the state is without money available with which to make payment for such property at this time, and cannot therefore avail itself of the benefits of the lower bid for the conduct of the state prison unless such bidders agree to take over such property hereinabove referred to:

"Therefore the conditions above set forth are considered reasonable, expedient and proper and are by the board imposed.

"Thereupon it was duly and regularly moved and seconded, and the motion unanimously carried, that the board should stand adjourned until Tuesday, the second day of June, 1908, at the hour of 2 o'clock P. M., at which time further action will be taken in the premises and inquiry made as to whether or not the bidders have complied with the terms and conditions by the board

prescribed, and for the purpose of again considering the subject."

On June 1st the plaintiffs addressed a communication to the board, in which they allege that the matter of placing in the hands of the state treasurer $20,000 and executing an additional bond for $30,000 "was not contemplated when the call for bids was issued, or at least not explicitly stated in the said call"; but they say: "We are present to-day prepared to comply with all of said terms. We have with us a certificate which we are prepared to turn over to the state treasurer, said certificate representing $20,000, and a bond for $30,000. * * * Before submitting the said certificate and the said bond to your control, we desire to present the following: [Here follows a request that the board specify what property it is proposed to take over from McConley & McTague and what price is to be paid therefor.]" In making their deposit of $20,000 with the state treasurer and presenting their additional bond for $30,000, the plaintiffs exacted a receipt therefor, reciting: "This check (or bond) is received upon the express condition that the same is to be returned to the said parties if the state board of prison commissioners do not see fit to grant the conditions requested by the said parties in depositing the same and as contained in their letter of June 1, 1908, with regard to the same to the said board." On June 2d the board met and adjourned without action until June 3d, on which date, the minutes recite: "There being a question as to whether or not the bidders, Wyman & Henderson, had made compliance with the rules and regulations of the board adopted on May 7, 1908, at which time the contract was by the board awarded to Messrs. Wyman & Henderson, upon the performance of certain conditions fixed by the board as its regulations," the matter was referred to the attorney general for an opinion. On June 4th the attorney general, who is a member of the board, rendered an opinion, to the effect that it was for the board to determine whether or not its conditions had been complied with; and on the same day the board determined that its conditions had not been complied with, but, instead of taking any definite

action on that date, it gave the plaintiffs until the next day, at 10 o'clock, "within which to satisfy the board that they had made unconditional compliance with the board's terms and conditions made in awàrding the contract to them." On June 5th the board determined that Wyman & Henderson had "refused to comply with the terms and conditions of the award of the contract. In the light of all the testimony taken and in view of the order made by the board on yesterday, it is now ordered that the said award of the contract to Messrs. Wyman & Henderson be withdrawn and canceled, and that their bid be rejected." Thereupon the plaintiffs demanded and received the return of their certified check for $20,000 and their bond for $30,000, theretofore deposited by them, and afterward the plaintiffs caused to be duly made and executed on their part a bond for $50,000, conditioned as required by law, for the faithful performance of a contract for the care, custody and maintenance of the inmates of the state prison. This is an original proceeding in this court to compel the defendants to sign and execute a contract and agreement with the plaintiffs for the care of the inmates of the state prison. The proceeding is somewhat analogous to an application for the specific performance of a contract.

It appears that, after rejecting all second bids, the state board appointed a warden of the penitentiary; and considerable space is devoted in the briefs of counsel to the question of the authority of the board to do this. However, the matter is foreign to this inquiry, because the only question presented by this record is whether the board entered into an enforceable contract with the plaintiffs as alleged in the affidavit on which this proceeding is founded. The question of the authority of the board to appoint a warden does not come within the scope of the issues presented by the record; so that the only question to be determined is: Did the board of state prison commissioners enter into an enforceable contract with the plaintiffs for the care, custody, and maintenance of the inmates of the state prison?

If there was an unconditional acceptance of plaintiffs' bid, there seems to be no doubt, under the authorities cited by their counsel, that a contract was thereby made which may be enforced. (*Safety Insulated Wire Co.* v. *City of Baltimore*, 25 U. S. App. 166, 66 Fed. 140, 13 C. C. A. 375; *Adams' Case*, 1 Ct. of Cl. (U. S.) 192; *Argenti* v. *City of San Francisco*, 16 Cal. 256.) But was the plaintiffs' bid or proposal unconditionally accepted? It is contended by them that the conditions referred to in the resolution of the board were unlawful and unauthorized, and we agree with this contention. (*State ex rel. Mitchell* v. *Toole*, 26 Mont. 22, 91 Am. St. Rep. 386, 66 Pac. 496, 55 L. R. A. 644.) Whatever solicitude may have existed in the breasts of the members of the board (as plaintiffs insist is plainly shown by the record) to protect Conley & McTague and to insure to them an immediate sale of their property at a good price, the board had absolutely no authority to insist that, as a condition precedent to the award of the contract, the new contractors should furnish the money to enable the state to take over the property. This was an unauthorized assumption of power on their part. Concede that the board had theretofore obligated itself to protect Conley & McTague, the obligation at best constituted a claim against the state that should be presented, allowed and paid in the regular way; and the board exceeded its authority in urging the existing conditions as a reason for practically coercing Wyman & Henderson into relieving the state from a supposed obligation for which they, Wyman & Henderson, were in no way responsible. As a matter of fact, we are convinced from a perusal of the record that the position taken by the board amounted to a practical denial of the right of competition in the bidding, because, if the board insisted that the contract should not be awarded to any one who would not be willing to relieve the state of its supposed obligation to Conley & McTague, anyone who was not willing or able to assume that burden would have no chance to receive the contract, although he may have had unquestioned ability to care for the inmates of the prison at the lowest price

*per capita* per day. Such a condition, if embodied in the call
for bids, would have been unlawful and void. (*State ex rel.
Mitchell* v. *Toole, supra.*) It was the duty of the board upon
consideration of these bids to unconditionally determine which
was the lowest and best, and both the state and the bidders had
the right to insist that such determination should be made. But
the state board did in fact invite the plaintiffs, by reason of
the peculiar circumstances disclosed by the record, to incorpor-
ate in their bid an agreement to indemnify the state against the
claims of Conley & McTague. In the call for bids it volun-
teered the statement that all information respecting the owner-
ship of property at the prison might be obtained from the clerk
of the board. In view of the fact that the board had practi-
cally informed plaintiffs that whoever received the contract
must be prepared to take over this property, and that plain-
tiffs had affirmed their ability to do so, no other interpretation
can be placed upon this added paragraph in the second call.
And it is manifest that plaintiffs so understood it, because in
their second bid they offered not only to care for the prisoners
at thirty-nine cents *per capita* per day, but, in addition thereto,
offered to "guarantee the state against any liability which it
must legally or necessarily assume in the event of the awarding
of said contract to us," under such rules and regulations as
might be prescribed by the board.

We have, then, as between the parties to this proceeding, this
situation: The board invited bids for the care of the inmates
of the prison. The plaintiffs offered to care for such inmates
at thirty-nine cents *per capita* per day, and in addition there-
to, as an inducement to the board to declare their bid the lowest
and best, agreed to "guarantee" the state against any claim
that Conley & McTague might have, "under such rules and regu-
lations as the board" might prescribe. Acting upon the bid as
a whole, the board declared the bid of Wyman & Henderson to
be the lowest and best, *provided* that they should before any
contract was awarded pay into the state treasury $20,000 in
cash, to be expended by the board in purchasing the property

of Conley & McTague, and furnish an additional bond in the sum of $30,000, "conditioned that such bidders will, without cost or expense to the state, receive, accept and pay for such of the property of the present contractors, Conley & McTague, as the board may deem necessary or desirable to be used in connection with the conduct of the business and affairs of the said state prison after the said $20,000 cash shall have been exhausted by the board in payment for such property interest." Plaintiffs thereupon procured the cash and the bond and agreed to turn the same over to the board, provided the board would indicate in advance the property to be taken and the price to be paid therefor. This the board refused to do, and subsequently rejected the bid of plaintiffs, which had been theretofore conditionally accepted.

The ultimate solution of the question here presented is arrived at by the application of elementary principles of the law of contracts. Section 2130 of the Civil Code of 1895, under the title "Contracts" and the chapter "Consent," provides: "An acceptance must be absolute and unqualified or must include in itself an acceptance of that character which the proposer can separate from the rest, and which will conclude the person accepting. A qualified acceptance is a new proposal." Mr. Bishop in his work on Contracts (section 323) says: "Though there be an acceptance, if it is not to the exact thing offered, or if it is accompanied by any condition or reservation, however slight, in time or otherwise, no contract is made. It is so, for example, where new terms are introduced; they constitute an offer on the other side and leave the question open." Again: "The offerer has a right to prescribe in his offer any condition as to time, place, quantity, mode of acceptance, or other matters which it may please him to insert in and make a part thereof, and the acceptance to conclude the agreement must in every respect meet and correspond with the offer, neither falling within or going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand." (9 Cyc. 265.)

The plaintiffs in this case were the offerers. They offered to care for the inmates of the state prison at thirty-nine cents *per capita* per day, and, in addition thereto, to "guarantee" the state against certain supposed existing liabilities, under such rules and regulations as the state board should prescribe. The board replied, in effect: "Very well, we will declare you the lowest and best bidders and award the contract to you, provided you will 'guarantee' the state by doing certain things [setting forth the things to be done.]"

"An acceptance to be effectual must be identical with the offer and unconditional. Where a person offers to do a definite thing and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat, or it is a counter-proposal and in neither case is there an agreement." (9 Cyc. 267.) In the case of *Bruner* v. *Wheaton,* 46 Mo. 363, the court said: "In order that an acceptance may be operative, it must be unequivocal, unconditional, and without variance of any sort between it and the proposal, and it must be communicated to the other party without unreasonable delay. To constitute a valid contract there must be a mutual assent of the parties thereto; and they must assent to the same thing in the same sense. Therefore an absolute acceptance of a proposal, coupled with any qualification or condition, will not be regarded as a complete contract, because there at no time exists the prerequisite mutual assent to the same thing in the same sense."

In the case of *Egger* v. *Nesbitt,* 122 Mo. 667, 43 Am. St. Rep. 596, 27 S. W. 385, it was held that where one offers by letter to make a quitclaim deed for a named price, and the person receiving the letter accepts the offer on condition that other deeds are turned over to him, there was no binding contract.

In the case of *Corcoran* v. *White,* 117 Ill. 118, 57 Am. Rep. 858, 7 N. E. 525, it was said: "In order (that a contract of sale should result), there should have been an unconditional acceptance of (the) offer. There was here but a conditional acceptance—one upon the condition that the title was perfect."

In the case of *Harris* v. *Scott*, 67 N. H. 437, 32 Atl. 770, it was held that plaintiff's reply to the defendant's offer of certain stock at a specified price that he would pay the price if the defendant had actually received a similar offer from others, as stated in her letter, and would give him their names, was a rejection of the defendant's offer and a new proposal. The court said: "No contract for the sale of the shares to the plaintiff was completed. His acceptance of Mrs. Scott's offer was conditional. Their minds did not meet." (See, also, *Northam* v. *Gordon*, 46 Cal. 582; Page on Contracts, sec. 47.)

Treating the case as though plaintiffs' bid contained but one offer—that is, that they would care for the prisoners at thirty-nine cents per head per day, and that the counter-proposition that plaintiffs should also indemnify the state was first proposed by the board—there was no contract, for the reason that the counter-proposition was not accepted by the plaintiffs. And it makes no difference whether or not the board had authority to impose the additional terms, because the record shows that the board never intended to award the contract unconditionally, and the minds of the parties never met on that point. Indeed, the record shows that the plaintiffs never believed that the board had accepted the bid unconditionally. There is no contract unless the parties thereto assent; and they must assent to the same thing in the same sense. It is essential to the existence of every contract that there should be a reciprocal assent to a definite proposition. (*Spinney* v. *Downing*, 108 Cal. 666, 41 Pac. 797.) Mr. Page in his work on Contracts (section 42) uses this language: "An intention to accept the terms of the offer as valid is ordinarily an essential element of a valid acceptance." He cites the following cases in support of the text, viz.: *Regan* v. *Regan*, 192 Ill. 589, 61 N. E. 842, *Holmes* v. *Holmes*, 129 Mich. 412, 95 Am. St. Rep. 444, 89 N. W. 47, *Fuller Co.* v. *Houseman*, 114 Mich. 275, 72 N. W. 187, and *Hanson* v. *Nelson*, 82 Minn. 220, 84 N. W. 742, in all of which importance is attached to the intention of the party who was alleged to have made the contract. This case is much stronger

than any of those just cited, as the record of the proceedings
of the defendant board shows that the intention was not to de-
clare the plaintiffs the lowest and best bidders, unless the con-
dition subsequent was complied with.  And the plaintiffs are
not in position to claim that the board awarded them the con-
tract stripped of all conditions, because it is manifest that the
offer to "guarantee" the state, made by them, was the induce-
ment which led the board to make its finding.

It follows from the foregoing that the defendant board has
never passed upon the merits of the respective bids, as, under
the law, it was its duty, unconditionally and without qualifica-
tion or reservation, to do.

The writ prayed for is, for the reasons stated, denied.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY
concur.